Filed 2/9/21  P. v. Elkins CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JARED DANIEL ELKINS,<br><br>    Defendant and Appellant. | D075724<br><br><br>(Super. Ct. No. SCD274583)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 20, 2021, be modified as follows:

1.  On page 40, insert the following new footnote 9 following the first sentence of the last paragraph:

> In a petition for rehearing, Elkins asserts that "[t]he trial court stated it did not base its removal order on this allegation" regarding the insult.  The trial court, however, simply stated that it did not take the insult "personally" and it was not "the *sole* basis for his exclusion."  (Italics added.)

There is no change in judgment.

The petition for rehearing filed by appellant is denied.

 

 

McCONNELL, P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075724 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274583) |
| JARED DANIEL ELKINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found appellant Jared Elkins guilty of forcible rape (Pen. Code, § 261, subd. (a)(2)),[1] two counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)), and forcible sexual penetration (§ 289, subd. (a)). Elkins's convictions arise from an incident in which he and his wife spent the night with his wife's relatives and, after a night of drinking, Elkins forced himself on his wife's young cousin, Samantha.[2] Samantha testified that despite her attempts to push Elkins away and repeated pleas to Elkins to stop assaulting her, Elkins threatened to kill her if she made any noise. Samantha feared for her life, knowing that Elkins, a police officer, was carrying his off-duty firearm and could easily overpower her. Thereafter, Elkins used force to orally copulate Samantha and force her to orally copulate him, penetrated her anus and vagina with his fingers, and ultimately raped her. After his arrest and in his own testimony at trial, Elkins did not dispute that he had sex with Samantha, but claimed that not only did she consent to having sex, she initiated the encounter by flirting with him.

Thus, the central issue at trial was whether Samantha or Elkins was telling the truth regarding Samantha's consent or lack thereof. To bolster Samantha's testimony, the prosecutor called Elkins's now ex-wife as a witness, who testified that when Elkins was drunk, he often aggressively sought anal sex from her despite her disinterest. Another woman testified regarding her own experience with Elkins, who accompanied her home after

---

[1]    All further undesignated statutory references are to the Penal Code unless otherwise specified.

[2]    Throughout this opinion, we refer to the victim and other witnesses by their first names out of respect for their privacy. (See Cal. Rules of Court, rule 8.90(b).)

a night out drinking and attempted to forcibly have anal sex with her, despite her requests for him to stop and attempts to escape.

On appeal, Elkins contends that the trial court erred in failing to exclude the evidence regarding his actions toward the other women on different occasions. He also asserts the trial court erred in instructing the jury and allowing police officers and the prosecutor to "vouch" for Samantha's credibility. Additionally, he faults the trial court's handling of a situation during trial in which one of his friends engaged in a conversation with a juror and then interfered with the trial, leading the trial court to discharge the juror and exclude Elkins's friend from the remainder of the trial.

Considering each of Elkins's contentions in turn and cumulatively, we find no error. Accordingly, we affirm the judgment. However, the Attorney General notes a clerical error in the abstract of judgment, which erroneously states that Elkins's prison terms are to run concurrently rather than consecutively. We therefore remand with instructions that the trial court correct the error and forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation.

FACTUAL AND PROCEDURAL BACKGROUND[3]

On appeal, Elkins does not challenge the sufficiency of the evidence to support the jury's verdict. Accordingly, we provide only a brief recitation of the evidence at trial. Additional facts will be discussed where relevant in the following sections.

---

[3] For purposes of this section, we state the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.)

*The Prosecution Case*

Elkins and his wife, Jennifer, lived in Yuma, Arizona. Elkins was employed as a police officer for the Yuma Police Department and always carried a gun with him, even when he was off duty. In September 2017, Elkins and Jennifer travelled to San Diego to attend a music festival together as part of an effort by Jennifer to improve a "tough time" in their relationship. Elkins and Jennifer drove to San Diego the day before the music festival and planned to stay at Jennifer's aunt's house for the night. Jennifer's aunt, Kellie, lived in the house with her daughter, Samantha, who had recently graduated from college and returned to San Diego.

After Elkins and Jennifer arrived at the house, they walked with Kellie and Samantha down the street to have dinner. Elkins began drinking beer at the house and continued to drink at dinner. After dinner, they returned to Kellie's house to watch a movie together. Kellie and Jennifer sat together on one couch and Elkins and Samantha were on the other couch. During the movie, Elkins continued to drink more beer.

Jennifer fell asleep during the movie and went to bed in another room. After the movie ended, Kellie also went to bed. Elkins insisted that Samantha watch another movie with him and she felt obligated to do so. After the other two women went to bed, Elkins started to move closer to Samantha and brush his arm against her arm. Samantha tried to move away from Elkins, but he continued to move closer to her and grabbed her hand. Samantha was hesitant to accuse Elkins of anything improper given he was a family member, but she told him that she loved Jennifer and "would never, ever, ever do anything to put her in a situation or . . . disrupt her life." Samantha stood up, walked to the kitchen to get a glass of water, told Elkins she was going to sleep, and went into her bedroom.

4

Samantha heard Elkins walk into the kitchen and pour himself another beer. Elkins entered her bedroom and asked if he could get her a drink, which Samantha interpreted as an attempt to get her to drink more alcohol. Samantha tried to get him to leave by asking for a glass of water and pretended to be asleep when he returned. Rather than leave, Elkins started to "tuck her in" and proceeded to grope Samantha's body. When Samantha did not respond, Elkins began pacing and then walked out.

However, Elkins quickly returned, shut the door behind him, took off his shorts, and began fondling his penis. He approached Samantha, who was still pretending to be asleep, and forced his penis into her mouth. Samantha protested and told Elkins "no," leading Elkins to offer her a choice: either have sex with him or let him watch her put her fingers into her anus. Samantha refused to do either and threatened to yell. Elkins responded by telling Samantha he would kill her if she yelled. Samantha was terrified because she knew Elkins had his gun. She testified that at that moment, she realized that if Elkins was capable of raping her, he was also capable of killing her and the other two women sleeping in the house.

Elkins pulled the covers off the bed and took off Samantha's shorts. Samantha again pretended to be asleep, but Elkins forcefully flipped Samantha over, forced her legs apart, and started to touch her genitals with his hand. Samantha tried to push him off and told him to stop, but Elkins overpowered her and put his fingers up her anus. Elkins orally copulated her, put his fingers inside her vagina, and then inserted his penis and raped her. Elkins continued for several minutes and then ejaculated on Samantha's abdomen. Elkins stood up, got dressed, and left Samantha's room.

Samantha was still scared that Elkins might return and kill her, so she stayed silent and did not move. She sensed that Elkins was watching her from the other room to see what she would do, but eventually heard him get into bed. Samantha quietly left her room and went into her mother's bedroom. Samantha woke Kellie and told her that Elkins had raped her. Still in fear that Elkins would kill them, Samantha and Kellie climbed out of a window and sprinted away from the house.

After they had fled to a safe distance, Kellie called 911 and the police responded. Samantha was taken to a hospital for an examination, which revealed injuries consistent with sexual assault and sperm and other cells with DNA matching Elkins's DNA.

Other police officers went to Kellie's house and arrested Elkins. Elkins was taken to a police station for questioning.

*The Defense Case*

Elkins testified in his own defense to offer his version of events in which he claimed Samantha initiated the encounter by flirting with him and then consenting to have sex. He testified that while they were watching the second movie after the other women left, Samantha asked for sips of his beer, which he found unusual because she could have easily poured herself her own beer. He claimed as the night progressed, Samantha moved closer to him and eventually placed her right breast, through her clothes, on top of his hand. Elkins claimed that as he began to fondle her breasts, Samantha continued to cuddle with him and did not ask him to stop. Elkins testified that in the middle of the movie, Samantha left and walked into her bedroom. Elkins followed her and asked her to perform oral sex, which she agreed to do. Elkins testified that they continued to have consensual sex, after which Samantha told him not to tell his wife. Elkins claimed he left her room, went

6

to the restroom, and then fell asleep in the bedroom he was sharing with his wife.

<em>Jury Verdict and Sentencing</em>

On the fourth day of deliberations, the jury reached its verdict. Of the eight counts alleged in the information, the jury found Elkins guilty of forcible rape (count one), two counts of forcible oral copulation (counts three and six), and forcible sexual penetration (count seven). The jury found him not guilty on the remaining charges relating to committing the sexual offenses on an intoxicated person. The trial court sentenced Elkins to a total term of 20 years, consisting of the upper term of eight years for count one, the lower term of three years for counts three and six, and the middle term of six years for count seven. The court ordered that the terms be served consecutively.

Elkins filed a timely appeal.

DISCUSSION

I. *The trial court did not err in finding Caroline B.'s testimony to be admissible under Evidence Code section 1108*

A. *Background*

While Elkins was released on bail awaiting trial, a woman in his hometown of Yuma, Arizona, saw a local television news story about his trial. The woman, Caroline B., recognized Elkins as the man that she had met at a bar a few weeks earlier. She decided to contact the San Diego District Attorney's office to share information about her encounter with Elkins, who she believed had attempted to sexually assault her. Caroline feared retaliation by local police if she reported the offense given that Elkins worked for the local police department, but she ultimately was interviewed by the San Diego District Attorney's office and the Arizona State Department of Public Safety.

7

Before trial, the People filed a motion in limine seeking a ruling that Caroline's testimony regarding the uncharged sexual offense committed by Elkins was admissible under Evidence Code section 1108 (hereinafter referred to as section 1108) as propensity evidence. The People suggested that Caroline would testify that after meeting Elkins at a bar while he was released on bail, he went home with her and after engaging in consensual vaginal and oral sex, he held her down and attempted to have anal sex with her even though she expressed her nonconsent. In opposition, defense counsel suggested that such evidence was not admissible, largely because Caroline's testimony would not establish any unlawful sexual conduct. As characterized by defense counsel, "Caroline's is a story of consensual sex, or at least attempted consensual sex, consensual oral copulation and then only later a dispute about consent to engage in additional sexual acts the next morning while the two are laying in her bed together."

The trial court noted the conflicting characterizations regarding the incident and indicated it would have to review the police reports and interviews before making a ruling on admissibility. After reviewing the materials, the trial court granted the motion in limine and found Caroline's testimony to be admissible.

Before Caroline was called as a witness at trial, the court indicated to counsel, outside the presence of the jury, that it would apply the "reiteration rule" to not require defense counsel to object to Caroline's testimony to preserve the objection for appellate review. Thereafter, defense counsel did not object during Caroline's testimony regarding the general admissibility of her testimony.

At trial, Caroline testified that in March 2018, she went out for dinner and drinks with her mother and brother. She met Elkins at the bar and

8

talked to him for several hours while they both had multiple drinks.  Caroline left with Elkins and his relatives to go to another bar, where they both continued to drink.  Later, Elkins's cousin gave Caroline a ride home, where she went inside alone.  Caroline testified that when she got home, she was "feeling my drinks," so she got ready for bed and dozed off at about 2:30 a.m.

About a half an hour later, Caroline heard the doorbell and answered the door to find Elkins had returned.  Caroline testified that she was confused as to why he had returned, but she let him into the house.  Caroline lived with her mother and to get Elkins away from her, Caroline took him to her bedroom.  Elkins locked the bedroom door and starting kissing Caroline.  They started to have vaginal sex and Elkins aggressively pulled Caroline's hair and wanted to have anal sex.  Caroline told him to stop pulling her hair and that she would not engage in anal sex.  Caroline testified that she had to tell Elkins "a few times" that she would not have anal sex.  Elkins eventually stopped trying to have sex because he could not stay erect and they both fell asleep.

In the morning, they began to kiss again and progressed to Caroline performing oral sex after Elkins asked her to "go down" and pushed her "down there."  Elkins started to act more aggressively by putting his hand on top of Caroline's head and pushing her mouth very forcefully down onto his penis.  Caroline reacted by trying to lift her head and Elkins eventually let go.  Elkins then turned Caroline over onto her stomach and held her down with his hand on her back.  Elkins immediately tried to sodomize Caroline and she began to "squirm" away while telling him "no."  Elkins tried several times to insert his penis into her anus while forcefully holding Caroline down with his hand.  Caroline testified that she struggled against Elkins while he attempted to sodomize her for "more than a few minutes."  Elkins eventually

9

gave up and started to get dressed. Caroline asked Elkins, "Why in the world would you want to do anything that is going to hurt somebody else?" Elkins replied by asking Caroline, "Why wouldn't you want to do it if it brings me pleasure?" Elkins seemed frustrated and angry and walked out the door.

B. *Relevant Legal Principles*

"As a general rule, evidence that is otherwise admissible may be introduced to prove a person's character or character trait. ([Evid. Code,] § 1100.) But, except for purposes of impeachment (see § 1101, subd. (c)), such evidence is inadmissible when offered by the opposing party to prove the defendant's conduct on a specified occasion (§ 1101, subd. (a)), unless it involves commission of a crime, civil wrong or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) *other than a disposition to commit such an act* (§ 1101, subd. (b))." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

Section 1108 creates an exception to this general rule by expanding the admissibility of disposition or propensity evidence in sex offense cases. (*Falsetta*, *supra*, 21 Cal.4th at p. 911.) Subdivision (a) of section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

As the Supreme Court explained in *Falsetta*, "section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Falsetta*, *supra*, 21 Cal.4th at p. 911.) "As the Court of Appeal stated in one earlier case, 'Our elected Legislature has determined

10

that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.'" (*Id.* at pp. 911-912.)

"[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta, supra,* 21 Cal.4th at p. 915.)

Section 1108 requires the prosecution to disclose the evidence it intends to admit before trial. (*Id.* at subd. (b); see also § 1054.7.) If the evidence is challenged by the defendant before trial, the trial court must make a threshold legal determination regarding whether the proffered evidence alleges a "sexual offense," as defined by section 1108. (*People v. Cottone* (2013) 57 Cal.4th 269, 282 (*Cottone*).) The prosecution does not have to establish that the defendant was convicted of a sexual offense for the underlying conduct; as long as the evidence, if believed, establishes the conduct would constitute a criminal sexual offense, evidence of the uncharged offense is admissible under section 1108. (*People v. Lopez* (2007) 156 Cal.App.4th 1291, 1298-1299.)

This threshold inquiry limits the possible prejudice under the section 1108 exception. Section 1108 "reflects a policy choice striking a balance

11

between the general ban on character evidence to prove conduct, and an exception permitted in strictly limited circumstances. The trial court ensures that the policy choice is honored by performing its screening function under [Evidence Code] section 405." (*Cottone*, *supra*, 57 Cal.4th at pp. 285-286.) When making this determination, the trial court applies the preponderance of the evidence standard of proof. (*Id.* at pp. 286-287.)

If the trial court determines the evidence, if believed by the jury, is sufficient to establish the defendant committed the uncharged sexual offense, it must also determine whether the evidence is inadmissible pursuant to Evidence Code section 352. (Evid. Code, § 1108, subd. (a), see generally *Falsetta*, *supra*, 21 Cal.4th at pp. 916-918.) "The court's ruling under section 1108 is subject to review for abuse of discretion." (*People v. Loy* (2011) 52 Cal.4th 46, 61 (*Loy*).)

C. *Analysis*

As an initial matter, Elkins contends that this court should focus on the evidence considered by the trial court—i.e., Caroline's pretrial interviews—at the time it considered the People's motion in limine rather than her trial testimony to determine whether the trial court erred in finding the evidence to be admissible. Elkins contends this distinction is critical, asserting that "[a]lthough Caroline's trial testimony was somewhat consistent with the proferred pretrial interviews, the two diverged in several respects." This argument, however, is premised on a mistaken understanding of the effect of the order granting the motion in limine and the scope of our review regarding the admissibility of evidence.

"Motions *in limine* are a commonly used tool of trial advocacy and management in both criminal and civil cases. Such motions are generally brought at the beginning of trial, although they may also be brought during

12

trial when evidentiary issues are anticipated by the parties.  In either event, they are argued by the parties, either orally or in writing or both, and ruled upon by the trial judge." (*People v. Morris* (1991) 53 Cal.3d 152, 188 (*Morris*); overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

A ruling on a motion in limine does not foreclose a new consideration of the admissibility of the evidence actually introduced at trial.  Thus, to preserve the issue of admissibility for appellate review, the party opposing admission of the evidence must ensure one of three steps is taken:  (1) object at trial when the evidence is introduced; (2) stipulate with the opposing party regarding the effect of the trial court's pretrial ruling; or (3) rely on the trial court to "make it clear to counsel . . . not only what the ruling on the motion is, but whether further objection or argument is desired when the evidence is presented." (*Morris*, *supra*, 53 Cal.3d. at p. 190; see also *People v. Brown* (2003) 31 Cal.4th 518, 547 [motion in limine challenging admissibility of evidence under Evid. Code, § 352 must generally be renewed at trial], *People v. Karis* (1988) 46 Cal.3d 612, 634, fn. 16.)

Here, the trial court made clear that defense counsel did not have to object when Caroline testified to preserve his objection to the evidence.  Based on the trial court's representation that the objection was preserved, which the People did not oppose, we treat Elkins's opposition to the motion in limine as "a continuing objection to admission." (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.)

However, to the extent there were variations between the prosecution's pretrial offer of proof and Caroline's actual testimony, Elkins was required to raise a new objection to any "new" evidence and, by failing to do so, "may not now complain of any such variations." (*People v. Champion* (1995) 9 Cal.4th

13

879, 925.) "[I]f the evidence presented during trial is substantially different from that presented at the hearing on the motion *in limine* or included in an offer of proof, it is incumbent on the party who made the motion to renew the objection to the evidence." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1184.)

Here, Elkins did not object at trial despite his claim on appeal that Caroline's testimony was different than her statements made in the pretrial interviews. Instead, Elkins argues that Caroline's pretrial interview statements would have been inadmissible. But the People did not introduce her pretrial statements as evidence at trial.[4] Because such evidence was not introduced at trial, whether or not it would be admissible is not a question we need consider. On appeal, we must consider whether "the *admitted* evidence" should have been excluded, not whether some hypothetical evidence that was *not* admitted would have been inadmissible. (Evid. Code, § 353, subd. (b), italics added.)

Regardless, having reviewed both Caroline's pretrial statements and her trial testimony, we conclude they are sufficiently similar to not alter our analysis or require Elkins to raise a new objection at trial to preserve the issue for appeal. Given the substantial similarity, we review the evidence actually presented to the jury rather than statements made in untranscribed interviews not presented to the jury to determine whether the admission of Caroline's testimony resulted in a miscarriage of justice. (See, e.g., Evid. Code, § 353, subd. (b) [appellate court may only reverse judgment if it is of

---

[4]    The defense introduced a small portion of the transcript regarding Caroline's answer to a question regarding what happened the night before that is not relevant to her testimony regarding Elkins's attempt at forcible sodomy in the morning.

14

the opinion that the *admitted* evidence should have been excluded "on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."].)

On appeal, Elkins first contends that Caroline's testimony does not establish that he committed a sexual offense. In response, the People contend that Caroline's testimony establishes the sexual offense of attempted forcible sodomy (Pen. Code, § 286.) Evidence Code section 1108's definition of sexual offense includes such an offense. (Evid. Code, § 1108, subds. (d)(1)(A) & (d)(1)(F).) The question, therefore, is whether Caroline's testimony, if believed, is sufficient to establish the elements of attempted forcible sodomy.

In arguing the evidence was insufficient, Elkins relies primarily on the discussion in *In re John Z.* (2003) 29 Cal.4th 756 (*John Z.*), which involved the difficult factual scenario where a consensual sexual encounter turns into a forcible criminal sex offense after the victim withdraws her consent. In *John Z.*, the defendant and victim began to have sexual intercourse and, while the evidence of the victim's consent was inconclusive, the court assumed, for purposes of argument, the victim had "impliedly consented to the act, or at least tacitly refrained from objecting to it, until defendant had achieved penetration." (*Id.* at p. 760.) However, the victim then withdrew her consent by struggling to get away from the defendant as he grabbed her and pushed her down. (*Id.* at p. 763.) The victim also repeatedly asked defendant to stop, but defendant continued the sex act for at least four or five minutes. (*Ibid.*) Although the Supreme Court rejected the defendant's argument that a man must be given a reasonable amount of time "to quell his primal urge," it concluded that the defendant "was given ample time to withdraw but refused to do so despite [the victim]'s resistance and objections." (*Ibid.*) The court held that "the offense of forcible rape occurs

15

when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection." (*Id.* at p. 760.)

Relying on *John Z.*, Elkins argues that the evidence "established that Elkins tried to penetrate Caroline during consensual sex, she objected and he abandoned his effort. Elkins should not be branded a sexual offender for merely trying to engage a woman in a different sex act during consensual sex, where he stopped and did not force himself on her after she objected and moved away from him."

Elkins's argument, however, is betrayed by the evidence. Caroline testified that after engaging in consensual oral sex, Elkins turned Caroline over, held her down, and attempted to have anal sex. Caroline then began to "squirm away" and told Elkins "no."

If, as Elkins suggests, the encounter had stopped at the point Caroline first objected or quickly thereafter, Caroline's testimony may not have been admitted. But Elkins did not stop. Instead, *after* Caroline said "no" and attempted to squirm away, Elkins repeated his attempts to sodomize Caroline while he held her down with his hand. Caroline testified that Elkins continued his attempt for "more than a few minutes" while she continued her struggle.

This evidence, if believed by the jury, was sufficient to establish the criminal offense of attempted forcible sodomy. Elkins's forcible attempt satisfied the standard set forth in *John Z.* because "during apparently consensual intercourse, the victim expresse[d] an objection and attempt[ed] to stop the act and the defendant forcibly continue[d] despite the objection." (*John Z.*, *supra*, 29 Cal.4th at p. 760.) Thus, the trial court did not err in

16

determining that the evidence alleged a "sexual offense," as defined by section 1108.  (*Cottone, supra*, 57 Cal.4th at p. 282.)

Elkins also contends that even if the evidence is generally admissible because it meets the definition of "sexual offense" in section 1108, it is inadmissible under Evidence Code section 352.  In exercising its discretion to determine whether evidence of a sexual offense that would be admissible pursuant to section 1108 should nevertheless be found inadmissible under section 352, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917; see also *Loy, supra*, 52 Cal.4th at p. 61.)

Considering the trial court's admission of Caroline's testimony under Evidence Code section 352, we see no abuse of discretion.  The Legislature enacted section 1108 as an expression of its belief that evidence of other sexual offenses committed by the defendant are " 'particularly probative' " in cases involving other sexual offenses.  (*People v. Story* (2009) 45 Cal.4th 1282, 1293.)  Here, Elkins primarily argues the evidence is not probative because even if the jury believed Caroline, her testimony fails to establish that he committed any criminal sexual offense.  As discussed *ante*, we disagree with Elkins's characterization of Caroline's testimony.

17

Considering the similarity of the charged offense involving Samantha and the uncharged offense involving Caroline, " '[i]t is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' " (*Loy*, *supra*, 52 Cal.4th at p. 63.) Moreover, beyond both being sex offenses, the two offenses bear other similarities. In both instances, Elkins took advantage of women, after drinking heavily with them, by using his physical strength and an abuse of the trust they placed in him to force them to perform various sexual acts, including a focus on anal sex. These similarities heighten the probative value of Caroline's testimony.

Elkins also focuses on the uncertainty that any sexual offense occurred by noting that law enforcement in Arizona did not file charges against Elkins and that Caroline's testimony was not corroborated by an independent source. While being charged and ultimately convicted would bolster the certainty that Elkins committed these offenses, the fact that he was *not* charged does not limit the admissibility of Caroline's testimony. (*Lopez*, *supra*, 156 Cal.App.4th at pp. 1298-1299.) Moreover, the differing burdens of proof must be considered in this context: although a criminal conviction requires the defendant's guilt to be established beyond a reasonable doubt, section 1108 permits admission of evidence under the more lenient preponderance of the evidence standard. (*Lopez*, at p. 1299.) "A defendant may avoid conviction of a sexual offense because of the more stringent burden of proof, either because the prosecutor may not feel he or she can meet the burden, or because the jury concluded the prosecution failed to meet the burden. When the evidence is introduced at a subsequent trial as evidence of a prior sex offense, however, the jury may conclude the same evidence meets the preponderance of the evidence standard and utilize the evidence as permitted by law." (*Ibid*.) While the trial court should consider the issue of

certainty when considering admissibility, any vestigial uncertainty surrounding Caroline's testimony did not require the trial court to find the evidence to be inadmissible under section 352.

Elkins also contends Caroline's testimony was confusing to the jury because it "resulted in a distracting mini-trial on the encounter between Caroline and Elkins." Certainly, the potential for confusion and distraction is increased when the prosecution seeks to admit evidence of an uncharged offense, rather than an offense for which the defendant was convicted, under section 1108. (See, e.g., *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) However, when the evidence of the uncharged offense is "no more inflammatory than the testimony concerning the charged offense," the potential for prejudice is decreased. (*Ibid.*) Here, Caroline's testimony was no more inflammatory than the multiple witnesses testifying about Elkins's offense involving Samantha. While the "mini-trial" led to some potential for confusion and caused a greater burden on Elkins and his counsel to defend himself against Caroline's testimony, the circumstances here mirror those seen in many trials where evidence of uncharged sexual offenses is admitted pursuant to section 1108.

At most, Elkins establishes that the jury was likely influenced by Caroline's testimony to support its verdict finding Elkins guilty, but this is the point of section 1108 evidence. Evidence Code section 352 is focused on preventing *undue* prejudice, not any prejudice at all by unfavorable evidence. " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code

19

speaks in terms of undue prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail.  [Citation.] " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citations.]"  [¶]  The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]  'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citations.]  In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)

Considering the entirety of the circumstances, we conclude that the trial court did not abuse its discretion in finding Caroline's testimony to be admissible pursuant to section 1108 and Evidence Code section 352. Caroline's testimony was directly relevant to the central issue at trial regarding whether the jury should believe Samantha's testimony that Elkins would force himself on her without consent.  While some factors suggested a potential for heightened prejudice, the trial court carefully weighed all of the factors and reasonably exercised its discretion to find the evidence admissible.

20

II. *The trial court did not err in instructing the jury regarding the offense of attempted forcible sodomy*

Elkins also challenges the jury instructions regarding the uncharged sexual offense against Caroline of attempted forcible sodomy. Relying on *John Z.*, discussed *ante*, he contends the instructions permitted the jury to wrongly find he committed the offense of attempted forcible sodomy even if he abandoned his efforts after Caroline objected. As characterized by Elkins, he asserts the instructions permitted the jury to "find Elkins criminally liable if he tried to commit sodomy without Caroline's consent, even if he abandoned his effort after he realized she objected." We disagree.

A. *Background*

The trial court instructed the jury using the standard form jury instructions. For the offense of sodomy by force, the court instructed that to find Elkins committed the offense of sodomy, "the People must prove the following: 1. The defendant committed an act of sodomy with another person; 2. The other person did not consent to the act; And 3. The defendant accomplished the act by force."

Recognizing the People were alleging only that Elkins committed *attempted* forcible sodomy, the court also instructed the jury regarding attempt. The court instructed that "[t]o prove that the defendant committed an attempt to commit a crime, the People must prove the following: 1. The defendant took a direct, but ineffective step towards committing the crime of sodomy by force; And 2. The defendant intended to commit the crime of sodomy by force."

Elkins did not object to these instructions despite his numerous opportunities to do so.

B. *Relevant Legal Principles*

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instructions in a manner that violated the defendant's rights.' [Citation.] We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular instruction." (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.) " 'Errors in jury instructions are questions of law, which we review de novo.' " (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642.)

A defendant's failure to object to an alleged instructional error results in a forfeiture of the issue unless the error affects the defendant's substantial rights. (§ 1259; see, e.g., *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

C. *Analysis*

The Attorney General correctly argues that Elkins forfeited his claim of instructional error by not objecting below. Regardless, even assuming Elkins did not forfeit his claim, we see no error.

Elkins contends, and we do not necessarily disagree, that it was *possible* for the jury to find that "Elkins stopped trying to have anal sex with Caroline after she communicated her objection to Elkins." Elkins correctly argues, relying on *John Z.*, that if he stopped his attempt when Caroline communicated her objection, the evidence would not support that he committed any criminal offense. (*John Z.*, *supra*, 29 Cal.4th at p. 760 ["the offense of forcible rape occurs when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection."].)

22

However, Elkins then *incorrectly* contends that the trial court erred in instructing the jury because in this situation, the instructions would have permitted a finding that he committed the offense. This contention is premised on a misunderstanding of the relevant instructions, which correctly stated the law.

To constitute an attempt, the prosecution must establish *two* elements: "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "When a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime [citation], and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt." (*People v. Toledo* (2001) 26 Cal.4th 221, 230.)

As applied here, in the hypothetical described by Elkins, his attempt to have anal sex before Caroline's objection would include "a direct and ineffectual act done" toward the commission of sodomy, but it would *not* include the necessary element that Elkins have the specific intent to commit forcible sodomy, i.e., an attempt to engage in sodomy by means of force without the victim's consent. At that point, Elkins would not have any intent to commit the offense because he believed he was acting with Caroline's consent. Thus, assuming the jury followed its instructions, it would not be able to find that Elkins committed the offense in that hypothetical circumstance.

Instead, the jury was instructed that it could find Elkins committed attempted forcible sodomy only if it found Elkins "took a direct, but ineffective step towards committing the crime of sodomy by force; And 2. The

defendant intended to commit the crime of sodomy by force." As instructed by the companion instruction regarding the elements of sodomy by force, the jury could find that Elkins intended to commit the offense of sodomy by force only if it also found he intended to have anal sex without Caroline's consent. In this scenario—supported by Caroline's testimony at trial—the jury would have to find Elkins took a direct step toward having anal sex *after* Caroline withdrew her consent. Although Elkins contests the factual basis for that finding, as discussed *ante*, the jury instructions correctly stated the applicable law. Thus, the trial court did not err in instructing the jury in this regard.

III. *The trial court correctly found Jennifer's testimony regarding Elkins's practice of seeking anal sex to be admissible under Evidence Code section 1101*

Elkins contends the trial court erred in allowing his ex-wife, Jennifer, to testify regarding her past sexual experiences with Elkins. He contends that her testimony regarding his pattern of seeking anal sex while intoxicated was inadmissible character evidence that was more prejudicial than probative. We conclude, guided by the deferential standard of review, that the trial court did not abuse its discretion in allowing the admission of this evidence under Evidence Code section 1101. Moreover, even if we were to conclude the trial court abused its discretion, we nevertheless conclude that any minimal prejudice to Elkins was insufficient to warrant reversal of the judgment.

A. *Background*

When the prosecution called Jennifer to testify, Elkins raised an objection to any testimony regarding "the nature of their sexual relationships, the acts they engaged in and how they engaged in those acts." The prosecution indicated it intended to elicit testimony regarding Elkins's

24

fixation on anal sex, which it explained was relevant to explain Elkins's command to Samantha to either perform oral sex or put her fingers in her anus. The trial court ruled that such evidence was admissible under Evidence Code section 1101, suggesting that such evidence "[goes] to motive."

Jennifer testified primarily about the events preceding the offense and her relationship with Samantha. She also testified that Elkins enjoyed having anal sex and although she was not comfortable with it and did not enjoy it, she obliged on occasion out of a sense of marital duty. She later stated that when Elkins had been drinking, he was more "direct or forceful" about having sex. Jennifer clarified that Elkins was only interested in anal sex or putting his fingers in her anus on nights when he had been drinking.

During closing argument, the prosecution briefly referred to this testimony, reminding the jury that "you heard from his ex-wife, when the defendant drinks, he is more forceful, aggressive and obsessed with anal."

B. *Relevant Legal Principles*

As we discussed in relation to propensity evidence under section 1108, the general rule under Evidence Code section 1101 is that character evidence is inadmissible to prove the defendant's conduct on a specific occasion except in limited circumstances. (See, e.g., *Falsetta*, *supra*, 21 Cal.4th at p. 911.) Such evidence is admissible if "relevant to prove some fact (e.g., motive, intent, plan, identity) *other than a disposition to commit such an act* (§ 1101, subd. (b))." (*Falsetta*, at p. 911.) Here, the admissibility of Jennifer's testimony is governed by Evidence Code section 1101, not section 1108, because no criminal act is alleged.

"Cases sometimes describe Evidence Code section 1101(b) evidence as 'prior offenses' or 'prior bad acts.' Both shorthand formulations are imprecise. Evidence Code section 1101(b) authorizes the admission of 'a

25

crime, civil wrong, or *other act*' to prove something other than the defendant's character. (Italics added.) The conduct admitted under Evidence Code section 1101(b) need not have been prosecuted as a crime, nor is a conviction required." (*People v. Leon* (2015) 61 Cal.4th 569, 597.) "The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact. [Citation.] 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " (*Id.* at p. 598) "Greater similarity is required to prove the existence of a common design or plan. In such a case, evidence of uncharged misconduct must demonstrate ' "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' " (*Ibid.*)

We review the trial court's decision to admit evidence under Evidence Code section 1101 for abuse of discretion. (*People v. Harris* (2013) 57 Cal.4th 804, 841.) Although some evidentiary rulings may be a "rather close call" where an appellate court may disagree with the ruling, such a ruling should nevertheless be upheld where the appellant fails to show the trial court abused its discretion " ' "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1119; see also *Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881-882 ["We could therefore disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable

26

exercise of its discretion, we are not free to substitute our discretion for that of the trial court."].)

C. *Analysis*

Considering Jennifer's testimony as a whole, in the context of the entire trial, we conclude the trial court did not abuse its discretion by admitting the evidence under Evidence Code section 1101, subdivision (b). Although the admissibility of this evidence may be a "close call" subject to disagreement, we do not believe the trial court's decision was arbitrary, capricious, or patently absurd. Instead, the trial court made a reasonable decision on a complex question that we will not disturb on appeal.

The trial court could reasonably determine that Jennifer's testimony was *not* introduced, as Elkins suggests, simply to suggest that because he enjoys anal sex, he is a deviant with a propensity to commit criminal sexual offenses. Instead, the evidence was relevant to establish Elkins's motive, intent, and common design of forcefully seeking anal sex or digital anal penetration after he has been drinking, regardless of the woman's interest in participation. The trial court did not abuse its discretion in finding this evidence to be admissible as relevant evidence under subdivision (b) of section 1101.

Elkins further contends that even if the evidence was admissible under Evidence Code section 1101, subdivision (b), it was nevertheless inadmissible under Evidence Code section 352 because it was unduly prejudicial. We disagree. "The prejudice that section 352 is designed to avoid is not the damage that naturally results from highly probative evidence, but rather the prospect of leading the jury to prejudge a person or focus on extraneous factors." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192.) Jennifer's brief comment regarding Elkins's common sexual practices did not "consume

27

too much time, cause undue prejudice, confuse the issues, or mislead the jury." (*Ibid.*)

Perhaps most importantly, even assuming the trial court abused its discretion in permitting Jennifer to testify in this regard, Elkins was not prejudiced by the admission of this evidence. Jennifer's passing reference to this issue was not of sufficient weight to support the conclusion that if this evidence was *not* admitted, the jury would have reached a different result. (*People v. Thomas* (2011) 52 Cal.4th 336, 356 [applying test for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 to admission of evidence pursuant to Evid. Code, § 1101].) Because Elkins fails to establish error or prejudice under the standards of review that govern our review, his argument for reversal on this ground has no merit.

IV. *Elkins fails to establish any improper "vouching" by the testifying police officers or the prosecutor*

Elkins contends the trial court erred in allowing the prosecutor and police officer witnesses to "bolster" Samantha's testimony by "vouching" for her credibility. Having reviewed the record, we conclude Elkins fails to establish any improper vouching by the witnesses or the prosecutor.

A. *Background*

During his cross-examination of Samantha, defense counsel asked Samantha to admit that, despite her testimony, she truly consented to having sex with Elkins and that she was not actually "victimized in this case." When Samantha denied she consented and claimed that she "was absolutely victimized in this case," defense counsel sought to impeach her by introducing a short portion of a video from a police officer's body worn camera recorded shortly after her rape. In the video, Samantha tells the officer that "I'm not a

victim." Samantha confirmed that she made that statement but complained that "[i]t was so out of context." Defense counsel asked no further questions.

The People responded by asking Samantha to put her comment that she was "not a victim" into context. During her redirect examination, Samantha explained that when she made that statement, she was "hysterical" and "humiliated that I was just raped. And I think anyone who has ever been violated like that is embarrassed."

The People also questioned Police Officer Diego Usma, who recorded the video, about Samantha's statement. He testified that although he did not understand what Samantha meant when she said she was "not a victim," Samantha was visibly upset and her actions did not "give . . . the impression that she was not a victim."

Police Sergeant Garrick Nugent, who had extensive experience working as a detective in the sex crimes unit, testified that he spoke to Samantha immediately after she made her statement that she was "not a victim." Sergeant Nugent testified that when Samantha said she was not a victim, he expressed that he agreed she was not a victim; confirming that she was a "survivor." Nugent explained that the terms "victim" and "survivor" were interchangeable but that "[o]ften individuals find the label of victim to be unpalatable. It implies . . . a hopelessness kind of feeling. And there are some people who take great exception to being labeled a victim." Nugent testified that based on his conversation with Samantha, he believed her comment that she was not a victim was aligned with her rejection of that label rather than a suggestion that the sex was consensual. Nugent testified based on his conversation with Samantha and her behavior, he "suspected" the sex was not consensual. He further testified that based on her behavior, "she portrayed as a typical victim would have." As to this last statement, the

29

trial court sustained defense counsel's objection pursuant to Evidence Code section 352 and instructed the jury to disregard the testimony. Later, Sergeant Nugent reiterated that if he believed Samantha was suggesting the sex was consensual, he would have noted that in his report, but he has no reason to suspect it was a consensual encounter.

During closing argument, the prosecutor argued that Samantha "told the truth" when talking to the police, tried to "give as many details as she could" and was "trying to do the best she could do and tell what happened to her." The prosecutor also referenced Samantha's mother's belief that Samantha "was telling the truth."[5]

B. *Relevant Legal Principles*

Elkins challenges the officers' testimony and the prosecutor's comments as improper vouching. He characterizes the officers' testimony as opinion testimony that Samantha was telling the truth regarding Elkins's criminal acts. He further contends the prosecutor could not opine in closing argument regarding the truthfulness of Samantha's testimony.

As Elkin correctly asserts, an expert witness is generally prohibited from offering opinion testimony regarding whether another witness is telling the truth or is otherwise credible. (See, e.g., *People v. Long* (2005) 126 Cal.App.4th 865, 871.) Similarly, a witness "cannot express an opinion concerning the guilt or innocence of the defendant." (*People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.) In the context of testimony regarding the statements and behavior of rape victims, an expert may dispel common misperceptions by testifying that the victim's actions are not irreconcilable with her claim to have been raped, but the expert may not specifically testify

---

[5] At trial, Samantha's mother testified that she "knew my daughter was telling the truth" without objection by defense counsel.

that he or she believes the offense occurred in the case at issue. (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.) We apply the abuse of discretion standard of review to the trial court's rulings regarding the admissibility of such evidence. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222.)

Similarly, a prosecutor may not "vouch" for a witness. (*People v. Rodriguez* (2018) 26 Cal.App.5th 890, 905 (*Rodriguez*).) The rule against "vouching," however, does not prohibit the prosecutor from generally commenting on a witness's credibility, but only from informing the jury that he or she thinks the witness is credible based on evidence outside the record. (*Ibid.*) " '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561; quoting *People v. Frye* (1998) 18 Cal.4th 894, 971.) "Misconduct arises only if, in arguing the veracity of a witness, the prosecutor implies she has evidence about which the jury is unaware." (*Fernandez*, at p. 561.)

C. *Analysis*

Elkins's challenge to the admissibility of the police officers' testimony is premised on a faulty premise. Rather than offering expert opinion testimony regarding whether Samantha was telling the truth and, by extension, whether Elkins was guilty of rape, the officers were merely offering their belief regarding the meaning of Samantha's statement that she was "not a victim." Elkins's own counsel opened the door to this testimony by playing a selective snippet of the video that included only this statement. As

Samantha immediately remarked, she believed this statement was taken out of context.

Evidence Code section 356 permits the whole of a conversation to be admitted to provide the necessary context when a party introduces only part of a conversation. The purpose of the rule "is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he [or she] may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Here, in addition to admitting the entirety of Samantha's statement to provide the necessary context, the prosecution sought to avoid any misunderstanding about her meaning by asking the officers who heard the statement to testify regarding their understanding of her statement that she was "not a victim" considering the entire context of her statement. The officers were not opining that Samantha was telling the truth or that Elkins was guilty, but merely that they did not perceive Samantha's statement that she was "not a victim" to be an admission that she consented to having sex with Elkins.

Such testimony is admissible. A percipient witness may offer opinion testimony when the "witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130.) A percipient witness's

testimony regarding his or her own observations about the intended effect of another person's statements is admissible opinion testimony. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1310-1311; see also *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 145-147.)

Elkins attempted to use the plain meaning of Samantha's statement that she was "not a victim" to suggest to the jury that she was admitting that Elkins committed no crime. The officers' testimony regarding what they observed when talking to Samantha was introduced to support the conclusion that Samantha's statement should not be taken at face value. As Sergeant Nugent testified, a woman who has been raped often rejects the "victim" label and would rather consider herself to be a "survivor." In other words, he was informing the jury, based on his experience, that the statement that "I'm not a victim" from a woman who was recently raped should not be interpreted as suggesting the sex was consensual. The officers' testimony regarding Samantha's statement, which they interpreted as conveying a complex meaning beyond the plain language of her words, was proper opinion testimony. Thus, the trial court did not abuse its discretion in finding the testimony to be admissible.

Similarly, Elkins mistakenly characterizes the prosecutor's statements as improper vouching.[6] Although the prosecutor told the jury that Samantha

---

[6]    As the Attorney General argues, Elkins did not object at the time the prosecutor made the challenged statements and has therefore forfeited the issue. (See, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 157.) However, Elkins contends that any objection would be futile or, if the issue is forfeited, his trial court was ineffective. Accordingly, even if we agree the issue is forfeited, we exercise our discretion to consider the merits of his argument on appeal. (*Rodriguez*, *supra*, 26 Cal.App.5th at p. 904 [appellate court may exercise its discretion to review a forfeited claim].)

was telling the truth, she did not rely on any outside evidence, her personal experience, or other improper matters in making the claim. Accordingly, no improper "vouching" occurred. (*Fernandez*, *supra*, 216 Cal.App.4th at p. 561.) In the absence of any misconduct or error, Elkins does not establish a basis for relief.

## V. *Elkins's claim of cumulative error at trial has no merit*

Elkins also contends that even if any of these individual errors was not sufficiently prejudicial to warrant reversal of the judgment, the cumulative effect was prejudicial. However, as discussed *ante*, we conclude that no error occurred. In the absence of any error, there can be no cumulative error. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382.) Thus, Elkins's claim of cumulative error fails.

## VI. *The trial court properly discharged a juror and excluded Elkins's friend from attending trial following an improper conversation between the juror and the friend*

### A. *Background*

In the middle of the trial, the prosecutor informed the court of an incident that occurred outside the courtroom. As relayed by the prosecutor, one of the jurors was seen having a loud discussion with a person related to Elkins in the hallway outside the courtroom. Samantha's boyfriend, who observed the conversation, informed the court that the juror and the person talked for about five minutes in front of all the other jurors. At that time, a member of the audience stood up and told the court that he was the person who spoke to the juror. The person (T.W.) told the court he was a friend of Elkins's family. T.W. told the court he was a fireman from Yuma and admitted he spoke to the juror for about five minutes. T.W. stated that they spoke about directions to a local shopping center, firefighting, and sports team mascots, including the mascot for T.W.'s school in Yuma.

34

The court then questioned the juror, Juror No. 1. The juror admitted to having the conversation. The juror's version of events mirrored the version offered by T.W.: the juror approached T.W. to ask for directions to lunch and the two had a conversation for a few minutes about a variety of topics not directly related to the trial. Juror No. 1 acknowledged that T.W. told him he was from Yuma.

The prosecutor moved to dismiss the juror, finding it prejudicial that Juror No. 1 had a conversation with a person obviously connected to Elkins. The prosecutor also noted that the act of questioning the juror about this incident caused additional prejudice. Defense counsel opposed the motion, suggesting the conversation was "innocuous" and resulted in no prejudice.

The trial court indicated it was "real unhappy about this" and reprimanded T.W. for speaking to the juror. T.W. interrupted the court to defend himself, leading the trial court to direct T.W. to "sit down." The court explained that as a public safety officer, T.W. should have known to not talk to a juror. The trial court also believed Juror No. 1 should have known better based on the instructions the court gave the jury to not talk to any person they believed may be associated with the case. The court found "by demonstrable reality" that Juror No. 1 should no longer serve, excused the juror, and replaced him with an alternative juror.

After the court excused Juror No. 1, T.W. left the courtroom and yelled "what an idiot," apparently in reference to the trial judge. The prosecutor later informed the court about this incident and asked the court to not allow T.W. to return to the courthouse. Defense counsel informed the court that he believed T.W. had left the state, but the court informed the parties that if T.W. returned, he would not be permitted to enter the courtroom.

Later in the trial, the court memorialized on the record that during a witness's testimony, T.W. tried to reenter the courtroom. The trial court signaled to the bailiff that T.W. should be excluded from the courtroom. T.W. left the courthouse and did not return. Defense counsel expressed concern over whether any jurors observed T.W.'s removal and what effect that may have had on the jury, but also objected to the exclusion of T.W. from the courtroom based on insulting the trial judge. The court indicated that T.W.'s exclusion was based on more than the insult and invited Elkins to file a formal motion.

Elkins raised the issues of the discharge of Juror No. 1 and the exclusion of T.W. from the courtroom in a subsequent request for a mistrial, which the trial court denied.

B. *Analysis: Discharge of Juror No. 1*

Pursuant to section 1089, a trial court has the discretion to discharge a juror if "upon good cause shown to the court [the juror] is found to be unable to perform his or her duty." "Although we have long held that the decision to discharge a juror under section 1089 is committed to the trial court's discretion [citation], assessing the breadth of that discretion, at least with regard to the decision to discharge a seated juror, is more complex than it otherwise might appear. (*People v. Fuiava* (2012) 53 Cal.4th 622, 711 (*Fuiava*).) While an earlier Supreme Court held that trial courts possessed limited discretion to discharge a juror, " '[t]he more modern rule provides that, under section 1089, a trial court "has *broad discretion* to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve." ' " (*Ibid.*) Regardless of the scope of the trial court's discretion, we review the trial court's discretion *not* under the typical abuse of discretion standard, "but rather under the

36

'demonstrable reality' test." (*Ibid.*) Under this test, the appellate court applies a less deferential review, which "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Id.* at p. 712.)

Here, the trial court discharged the juror based on a concern that the juror flagrantly disregarded the trial court's instructions. Before the start of trial, the court instructed the jurors regarding their duty to refrain from having conversations with people connected to the trial. The court instructed the jury that if someone attempted to have a conversation, "I don't expect anybody to be rude. Please feel free to say good morning or good afternoon, and you can smile, if you wish to do so. However, nothing beyond that. Certainly nothing connected with the case, but also if you need to know where the restroom is or where's a good place to eat or something like that, don't ask them, ask a bailiff or somebody else."

Juror No. 1 blatantly disregarded this instruction. It is improper for jurors to converse with anyone associated with the defendant during trial. (*People v. Cowan* (2010) 50 Cal.4th 401, 507 (*Cowan*).) A juror's violation of the court's instructions, even if the misconduct does not suggest a bias toward either side, is a sufficient basis for the removal of that juror. (*People v. Daniels* (1991) 52 Cal.3d 815, 863-864.)

To support his claim for error, Elkins relies on a series of decisions that conclude a trial court did not commit error by *not* discharging jurors who may have communicated with a person associated with the defendant. (*Cowan*,

*supra*, 50 Cal.4th at pp. 504-506; *People v. Cobb* (1955) 45 Cal.2d 158, 161; *People v. Woods* (1950) 35 Cal.2d 504, 511-512.) At most, these cases establish that a trial court may exercise its discretion to not discharge a juror in this situation. This, however, does not require that we conclude the trial court erred here by reaching the opposite conclusion. The record is undisputed that Juror No. 1 spoke with Elkins's friend in violation of the trial court's clear rule against such contact. Under the demonstrable reality test, this is sufficient to support the trial court's decision to discharge Juror No. 1. (*Fuiava, supra*, 53 Cal.4th at p. 711.) Accordingly, we conclude the trial court did not err in discharging the juror.[7]

C. *Analysis: Discharge of T.W.*

Relatedly, Elkins contends that the trial court's exclusion of T.W. from the trial violated his Sixth Amendment right to a public trial.[8] The requirement of a public trial is for the benefit of both the defendant and the public. (*Waller v. Georgia* (1984) 467 U.S. 39, 46 (*Waller*).) "The term 'public trial' has no single description, but is used in a relative sense and its meaning depends largely upon the circumstances of each particular case." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552 (*Esquibel*).) "Due to its

_____

[7] Elkins further contends that even if Juror No. 1 acted improperly, the trial court was required to take "lesser steps to ameliorate the situation," instead of discharging the juror. Elkins cites the decision in *People v. Allen and Johnson* (2011) 53 Cal.4th 60 (*Allen*) to support this contention. *Allen* does not support such a contention. At most, *Allen* suggests the trial court *may* consider less drastic measures to address juror misconduct.

[8] Elkins also contends he had a right to a public trial under the California Constitution. (*People v. Woodward* (1992) 4 Cal.4th 376, 382.) His rights in this regard under both constitutions appear coextensive and Elkins offers no basis to consider them as separate issues.

constitutional significance and the difficulty of proving prejudice, when a violation of the right to a public trial has occurred, there is no requirement to prove any specific prejudice to the appellant." (*Id.* at p. 551.)

Elkins asserts this court must apply a four-part test, set forth by the United States Supreme Court in *Waller*, to determine whether the trial court erred in excluding T.W. from the trial. The test discussed in *Waller* and relied upon by Elkins, however, is applied only when a trial court orders a complete closure of the courtroom to all spectators during trial, not when the court orders only a *partial* closure. (*People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421, fn. 1; see also *United States v. Sherlock* (9th Cir. 1992) 962 F.2d 1349, 1356-1357 (*Sherlock*).) The trial court did not order a full closure of Elkins's trial and we decline to apply the four-part test found in *Waller*.

Moreover, a sub-category of partial closures applies when the court excludes "only certain identified spectators." (*Esquibel, supra,* 166 Cal.App.4th at pp. 552-553.) In that circumstance, the identity of the excluded spectator is highly relevant, and the trial court may exclude a spectator to protect some "higher value." (*Id.* at p. 552.) So long as the trial court has a substantial reason for the exclusion and the exclusion is narrowly tailored, the defendant suffers no violation of his constitutional rights. (*Sherlock, supra,* 962 F.2d at p. 1357.)

A trial court's need to maintain court security and orderly courtroom proceedings is a substantial reason to justify a partial closure. (*Woodward, supra,* 4 Cal.4th at p. 385.) In *Esquibel,* the appellate court upheld the exclusion of two spectators that the prosecutor believed to be gang members who could later find witnesses in the neighborhood. (*Esquibel, supra,* 166 Cal.App.4th at p. 554.) In *People v. Pena* (2012) 207 Cal.App.4th 944, the

39

Court of Appeal held that a trial court did not err in excluding members of two defendants' families after some family members were following jurors around and making them uncomfortable. (*Id.* at pp. 947-949.)

Here, the trial court excluded T.W. after (1) he spoke with a juror during a break when it was apparent that he was affiliated with Elkins, (2) interrupted the court during proceedings to interject his opinion, and (3) yelled an insult at the judge regarding a ruling. The trial court reasonably concluded that Elkins's right to a *public* trial had to be balanced against his right to a *fair* trial while also maintaining order in the courtroom. The court narrowly tailored its exclusion to only T.W. and allowed Elkins's family and other supporters to remain for the entire trial. Although T.W. was a supporter of Elkins, nothing in the record suggests he carried any special importance to Elkins, his family, or the public in general necessitating his involvement in the trial. The trial court properly balanced the competing interests and decided to narrowly exclude one spectator that threatened to interfere with jurors and the completion of trial. Seeing no error, we conclude that Elkins's rights, and the rights of T.W. and the public broadly, were not violated in this circumstance.

VII. *The trial court must correct a clerical error in the abstract of judgment*

In the respondent's brief, the Attorney General notes that although the trial court imposed consecutive sentences at the sentencing hearing , the abstract of judgment reflects that the sentences are to run concurrently with the principal term. Elkins does not dispute this error in his reply brief.

The oral pronouncement of judgment reflects the true sentence, *not* the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) When clerical errors in the abstract of judgment are discovered on appeal, the appellate court may order the trial court to correct the abstract of judgment

to accurately reflect the oral pronouncement of judgment.  (*Id.* at p. 185.) Accordingly, we direct the trial court to amend the abstract of judgment to reflect that Elkins is to serve his prison terms consecutively, as determined by the trial court at the sentencing hearing.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to reflect the oral pronouncement of judgment and forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

41